**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CR. NO. 11-112 (RCL)** |
| **v.** | : | |
| | : | |
| **RUBEN DARIO VENEGAS RIVERA,** | : | |
| **also known as "Catracho,"** | : | **Sentencing: November 7, 2017** |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**
**AND MOTION FOR A DOWNWARD DEPARTURE**

### I.    Introduction

The United States of America, through its attorneys, the United States Attorney for the District of Columbia and the United States Department of Justice, Criminal Division, respectfully submit this memorandum in aid of sentencing.  After an early plea in this case, the defendant now stands convicted of the murder of Immigration and Customs Enforcement ("ICE") Special Agent Jaime Zapata, and of the attempted murder of ICE Special Agent Victor Avila.  These offenses took place on February 15, 2011, on Highway No. 57, near the city of San Luis Potosi, Mexico.  Pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. 5K1.1, the government moves for a downward departure in this case, and the United States respectfully requests that the Court sentence the defendant to a total of 30 years of incarceration for these offenses.

## II.    Background

### A.  Factual Background of the February 15, 2011, Attack on the ICE Agents[1]

On February 15, 2011, Immigration and Customs Enforcement ("ICE") Special Agents Jaime Zapata and Victor Avila were returning to Mexico City after meeting with other U.S. government agents in Matehuala, Mexico. As they drove South on Mexican Highway 57, outside of San Luis Potosi, they encountered two groups of Los Zetas ("Zetas") Cartel *sicarios* ("hitmen"), who attempted to carjack the Agents' vehicle while wielding AK-47s, AR-15s and handguns. The carjacking turned deadly and, as a result of the defendants' conduct that day, Agent Zapata was killed, bleeding out from his wounds before making it to the hospital. Although Agent Avila survived, his life has never been the same since that day.

At the time of the attack on the ICE Agents, the defendants were members of the Zetas Cartel, and were located in San Luis Potosi, Mexico. In 2011, the Zetas were a sophisticated and violent criminal organization spanning from Central America to the United States-Mexican border. Its hierarchy mirrored the command structure of the military. Each town or city within Zetas control had a commander, which was known as a plaza boss. The plaza boss reported to a regional commander or boss, who in turn reported to the Zetas leadership. The Zetas had a strict hierarchy and exercised control within the organization through threats, torture, and physical punishment. The Cartel routinely engaged in acts of violence to assert and maintain control over its territory through the use of its many *estacas* ("squad" or "hit squad"), which is a group of four armed Zetas *sicarios*, including one commander of the *estaca*, who patrolled the Cartel's territory by motor vehicle. The *estacas* carried out various crimes in furtherance of the Cartel's objectives, including

---

[1]   The following facts contained herein are based on the evidence introduced at trial through the government's witnesses, primarily Special Agent Victor Avila, Julian Zapata Espinosa ("Piolin"), Alfredo Gaston Mendoza Hernandez ("Camaron"), and Francisco Carbajal Flores ("Dalmata").

patrolling a portion of Zetas-controlled territory, providing protection for the Cartel's illegal activity from rival cartel members and law enforcement personnel, identifying and eliminating rival cartel members, and engaging in other criminal activity to include, among other things, kidnappings, carjackings, and assassinations. The *estacas* used weapons to carry out their duties, typically using long guns, AK-47s, AR-15s, or machine guns, and handguns, with each *sicario* typically being given use of one long gun and one hand gun.

In the weeks before the attack on the ICE Agents, Zetas *estacas* were patrolling for and carjacking vehicles in order to acquire these vehicles for the Cartel. Generally, the *estaca* commander, sometimes on orders from a more senior Zetas commander, would decide which vehicles to steal. It was a common, although not exclusive, practice for two or more *estaca* vehicles to be involved in these carjackings. During the carjackings, one *estaca* forced the victim's vehicle to stop while the other *estaca* pinned the victim's vehicle in from the side or rear to prevent its escape. The *sicarios* would exit their *estaca* vehicle and brandish their weapons, in order to get the victims to comply with their demands and give up their vehicles.

The defendants were Zetas *sicarios*, and on February 15, 2011, they were each assigned to an *estaca* with other *sicarios*. One *estaca* was commanded by Jose Garcia Sota (also known as "Zafado") and the other commanded by Julian Zapata Espinoza (also known as "Piolin").[2] Each *estaca* contained four *sicarios*, as follows:

| *Zafado's Estaca* | *Piolin's Estaca* |
|---|---|
| Jose Garcia Sota ("Zafado") | Julian Zapata Espinoza ("Piolin") |
| Jose Ismael Nava Villagran ("Cacho") | Ivan Quezada Pina ("Loco") |
| Alfredo Mendoza Hernandez ("Camaron") | Ruben Dario Banegas Rivera ("Catracho") |
| "Guacho" | "Raton" |

---

[2] Francisco Carbajal Flores, also known as "Dalmata," was assigned to Piolin's *estaca* but was on vacation on February 15, 2011, and thus not present at the attack on the ICE Agents.

During the attack on the ICE Agents on February 15, 2011, the two *estacas* were armed with both long guns and handguns. Piolin's *estaca* was armed with two AK-47s and two AR-15s, as well as handguns, and Zafado's *estaca* was armed with four long guns (including at least an AK-47, an AR-15, and an UZI), as well as handguns.

On February 15, 2011, Piolin's and Zafado's *estacas* were engaged in their typical duties of patrolling the area in and around San Luis Potosi, Mexico. That morning, the *estacas* had met up at a car wash in San Luis Potosi, where Piolin had noticed several individuals that he thought were members of a rival cartel. Piolin and Zafado, with the assistance of Loco and one other *sicario*, kidnapped these individuals and took them to a remote area, where members of the *estacas*, including at least Piolin and Zafado, beat the kidnap victims in an effort to obtain more information about them. A decision was made to hand over the kidnap victims to an associate of the Zetas cartel who worked for the Mexican Police, and the victims were ultimately placed on the back of Zafado's vehicle for that purpose.

Later that day, while pulled over on the North-bound side of Mexican Highway 57, members of Piolin's *estaca* noticed the ICE Agents' vehicle. The Agents were driving in a dark blue armored Suburban. Agent Zapata was driving and Agent Avila was in the front passenger seat. Raton noticed that the vehicle appeared to be armored and communicated the same to Piolin. Because armored vehicles were very valuable to the Cartel given their ability to withstand skirmishes with rival cartels and Mexican authorities, Piolin made the decision to pursue and stop the Agents' vehicle. Piolin's *estaca* conducted a U-turn on Highway 57, and then caught up to the Agents' vehicle. After confirming that it was, indeed, a vehicle that he wanted to steal, Piolin called Zafado and requested that Zafado and his *estaca* provide back up, and assist Piolin's *estaca*

in stopping the Suburban. The decision to stop and steal the agents' vehicle was made in furtherance of the Zetas' Cartel mission and its carjacking practice.

When both *estacas* caught up to the Agents' Suburban, they stopped it together in a manner similar with their prior practice. Described by Agent Avila as a "rolling roadblock," Piolin's *estaca* positioned itself in front of the Suburban, slowed down, and swerved left and right in order to force the Suburban off the road while preventing it from escaping. Zafado's *estaca* positioned its vehicle behind the Suburban, trapping the Suburban. Agent Avila observed members of the *estacas* brandishing their weapons at Agent Zapata and him, in an effort to intimidate them. Eventually, Agent Zapata, who was driving the Suburban and attempting to avoid a collision with the *estaca* vehicles slowing down and closing in on them, was forced to drive the Suburban on to the right-hand shoulder of the Highway, where he was finally boxed in by the two *estaca* vehicles.

Once the Agents' vehicle was stopped, the *sicarios* exited their *estacas* and surrounded the Suburban, and attempted to get the Agents' to give up the vehicle. Piolin and Camaron went to the driver's side door, and attempted to get Agent Zapata out of the driver's seat. While Camaron and Piolin succeeded in opening the driver's side front door, Agent Zapata was able to pull the door back shut and lock the Suburban. The other *sicarios* surrounded the Suburban, with Zafado, Cacho, Catracho and others ending up near the passenger side front door, where Agent Avila was sitting. All the *sicarios* had their weapons drawn and pointed at the Agents, and several *sicarios* were yelling at the Agents in Spanish to get out of the Suburban. Throughout the attack, Agent Avila tried to explain to the *sicarios* in Spanish that they were diplomats from the U.S. Embassy, and that the *sicarios* were mistaken in stopping them. Because the agents failed to comply with the commands to exit the Suburban, Piolin fired his handgun into the air near the front driver side of the Suburban. During this commotion the Suburban's passenger side front-door window was

lowered two-to-three inches, and two of the *sicarios* – Zafado and Cacho[3] -- inserted their weapons (a long gun and a handgun) into the window.  The situation grew tense, and shortly thereafter one of the *sicarios* at the passenger side front-door window fired into the vehicle, which began a volley of fire by all *sicarios*.

The *sicarios* fired nearly a hundred rounds during the attack, with several rounds entering the Suburban through the open passenger side front window.  Several of these rounds struck the Agents, including one which hit Agent Zapata in the femoral artery. Agent Avila was also hit in his left leg, but was able to assist Agent Zapata in driving the Suburban away from the firing *sicarios*.  The Suburban crossed the two South-bound lanes of traffic and crashed into the median, where it became disabled.  As the Suburban attempted to drive away, all the *sicarios* continued to fire at it.  The sicarios then loaded themselves into their *estacas* and drove away, but not before *sicarios* from both *estacas* fired additional rounds at the disabled vehicle.  Both *estacas* drove a short distance, performed a U-turn, and proceeded North to San Luis Potosi, where they eventually exchanged their vehicles and made their good escape.

After the *estacas* left the scene, Agent Avila continued with his efforts to ask for emergency assistance, and he was able to reach by telephone the U.S. Embassy in Mexico City and explain his general location.  Members of the Mexican Federal Police ultimately arrived at the scene of the attack, and had to talk Agent Avila out of the Suburban so that he and Agent Zapata could be

---

[3] This was the credible testimony presented at trial by Mendoza Hernandez, aka "Camaron."  The government recognizes, however, that other co-conspirators have identified different persons as being the likely "executioners" by the window.  For example, one co-conspirator initially stated that Piolin and Zafado were the two *sicarios* who inserted their weapons inside the vehicle and fired the shots that killed Agent Zapata and wounded Agent Avila.  This person later recanted his statement that Piolin was the shooter by the window, but maintained that Zafado was one of the executioners.  Similarly, Zapata Espinoza aka "Piolin" initially told the government that Catracho was the shooter by the window.  Piolin later explained that his previous statement was based on a statement he heard Catracho make at a later point.  Another co-conspirator told the government that Loco and Raton were the shooters by the window.  In short, throughout the investigation, various persons have been "identified" as the executioners by the window.

transported by helicopter to the hospital.  Although the Commander of the Federal Police in San Luis Potosi felt a pulse when he arrived on scene and examined Agent Zapata, Agent Zapata expired before he arrived at the hospital.  After the agents were taken away from the scene, the Mexican authorities did their best to secure and catalogue the scene. Later that same night, American personnel from the U.S. Embassy in Mexico City arrived in San Luis Potosi to provide assistance and receive information about the attack.

Law enforcement from Mexico and the United States worked together to identify the perpetrators. Piolin's *estaca*, which included Piolin, Loco, Catracho, and a fourth individual, Francisco Carbajal Flores ("Dalmata"), was arrested in the early morning hours of February 23, 2011.  At the time of the arrest, Mexican authorities recovered five long guns (three AK-47s and two AR-15s) from the location of the *estaca*'s arrest. Test-fired cartridges from three of the confiscated weapons (two of the AK-47s and one of the AR-15s) matched cartridges found at the scene of the attack on the ICE Agents.  Members of Zafado's *estaca*, including Zafado and Cacho, were arrested several weeks later.  Although Camaron was not with Zafado at the time of the arrest, he was identified and, in 2012, found to be held at a Mexican prison in Veracruz, Mexico.  All of these individuals either waived extradition or were extradited to the United States. Neither Raton nor Guacho were ever fully identified, located, or brought to justice for their participation in the attack, and based on information developed during the investigation they are believed to be dead.

### B.  Procedural History

On April 19, 2011, Catracho was charged in this case in a four-count Indictment with: (1) the murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 1111, 1114; (2) the attempted murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 1113, 1114; (3) the attempted murder of an internationally protected person, in violation of 18

U.S.C. §§ 1113, 1116; and (4) using, carrying, brandishing and discharging a firearm during and in relation to a crime of violence causing death, in violation of 18 U.S.C. §§ 924(c), (j)(1).   On August 1, 2011, Catracho pled guilty to (1) the murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 1111, 1114; and (2) the attempted murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 1113, 1114.

## III.   Legal Framework

### A.  Statutory Penalties

The crime of First Degree Murder of an Officer of the United States (Count 1), 18 U.S.C. § 1111, is punishable by a sentence of death or mandatory imprisonment for life, a fine of not more than $250,000, or both, and not more than five (5) years of supervised release. *See* 18 U.S.C. §§ 1111(b), 3571(b)(3), 3583(b)(1). Additionally, the defendant must pay mandatory restitution under 18 U.S.C. § 3663A.   In order to secure the extradition of Catracho from the Mexican government, the United States agreed not to seek a sentence of death, and accordingly, in this case the statute requires a sentence of life imprisonment.   The crime of Attempted Murder of an Officer or Employee of the United States (Count 2), 18 U.S.C. §§ 1113, 1114, is punishable by a maximum sentence of twenty (20) years' imprisonment, a fine of not more than $250,000, or both, and not more than five (5) years of supervised release. *See* 18 U.S.C. § 1113, 3571(b)(3), 3583(b)(1); *see also* § 1114(3) (defining attempted murder of an officer of the United States and referencing the penalties in § 1113). Additionally, the defendant must pay mandatory restitution under 18 U.S.C. § 3663A.

### B.  Legal Framework and Applicable Precedent

In determining the appropriate sentence, the Court engages in a two-step process. As one member of this court has held, "[*United States v.*] *Booker*, [543 U.S. 220 (2005),] requires judges

to engage in a two-step analysis to determine a reasonable sentence." *United States v. Doe*, 412

F. Supp. 2d 87, 90 (D.D.C. 2006) (Bates, J.).

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

The United States Sentencing Guidelines (the "Guidelines") are the initial starting point for the Court in sentencing. While in *Booker*, 543 U.S. 220, the Supreme Court held that the United States Sentencing Guidelines are no longer mandatory, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Id.* at 108-06 (*quoting United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* at 89 (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).

After that calculation, a sentencing judge must "tailor the sentencing in light of other statutory factors as well." *Booker*, 543 U.S. at 245. When weighing the § 3553(a) factors as part of its determination of an appropriate sentence, the Court should consider not only the nature and

circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care.  *See* 18 U.S.C. § 3553(a)(1), (2).  In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

The entire sentence imposed should be based on these factors, as a "sentencing package." *See United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999) ("sentences on multiple counts may comprise a 'sentencing package'"); *see also Greenlaw v. United States*, 554 U.S. 237, 253 (2008) (recognizing the practice of "sentencing packag[ing]" in cases with multiple counts of conviction).  If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law." U.S.S.G. § 5G1.2(c).

If necessary to effect the overall sentence, this Court may impose consecutive prison terms of up to the relevant maximum sentence for each independent count of Murder and Attempted Murder because, among other things, each count relates to an independent victim.  *See* U.S.S.G. § 5G1.2(d); *see also* 18 U.S.C § 3584(a) & (b) (noting that "[m]ultiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively" and ordering the court to consider the 3553(a) factors when deciding whether to impose a consecutive or concurrent sentence); *United States v. Fight*, 625 F.3d 523, 525-26 (8th Cir. 2010) (sentencing court reasonably imposed consecutive sentences on multiple counts of voluntary manslaughter involving three separate victims).

The First Degree Murder count carries with it a mandatory sentence of life imprisonment and, generally speaking, the Court need not apply the § 3553(a) analysis to that count, as the Court has no discretion but to imply the life sentence mandated by the statute. *See, e.g.*, *United States v. Carson*, 455 F.3d 336, 384-85 (D.C. Cir. 2006) (no remand necessary under *Booker* where mandatory life sentences were imposed). As numerous other circuit courts have held, *Booker* is not implicated where a defendant is subject to a mandatory life sentence.[4] However, under 18 U.S.C. § 3553(e), upon motion of the government, the Court has the authority to impose a sentence below a level established by statute as a minimum sentence in order to reflect a defendant's substantial assistance in the investigation or prosecution of another person. In this case, the government is moving for a lower sentence under 18 U.S.C. § 3553(e).

## IV.    Applicable Guideline Range

The government concurs with the analysis of the Presentence Investigation ("PSI") report writer, Kelly Kraemer-Soares, who has concluded that pursuant to the United States Sentencing Guidelines (hereinafter "USSG"), Catracho has a total offense level of 41, a criminal history category of I, and faces a guideline range of life in prison. *See* PSI at p. 13, ¶ 83; p. 20, ¶ 122.

## V.    Motion for a Downward Departure

Catracho rendered substantial assistance to the government warranting a downward departure. Pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1, upon motion of the government, the Court may depart from a statutory minimum or guideline compliance sentence to reflect a

---

[4] *See United States v. Duncan*, 413 F.3d 680, 683 (7th Cir. 2005*); United States v. Bermudez*, 407 F.3d 536, 545 (1st Cir. 2005); *United States v. Cardenas*, 405 F.3d 1046, 1048 (9th Cir. 2005); *United States v. Childs*, 403 F.3d 970, 972 (8th Cir. 2005); *United States v. Moore*, 401 F.3d 1220, 1222 n. 1 (10th Cir. 2005); *United States v. Groce*, 398 F.3d 679, 682 n. 2 (4th Cir. 2005); *United States v. Shelton*, 400 F.3d 1325, 1333 n. 10 (11th Cir. 2005); *United States v. Sharpley*, 399 F.3d 123, 127 (2d Cir. 2005).

defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.  The Government believes that Catracho has satisfied the criteria set forth in the statute and the guidelines, and, in recognition of his substantial assistance, moves for a downward departure to a sentence of 30 years' imprisonment.[5]

## VI.   Sentencing Analysis

### A.  Sentencing Recommendation

Given the facts and circumstances of the case, the history of the defendant, the information provided in the addendum to this sentencing memorandum, as well as the other 18 U.S.C. § 3553(a) factors, the government respectfully requests that the Court sentence the defendant to a term of 30 years' imprisonment on Count 1, and to a term of 20 years' imprisonment on Count 2 (to run concurrent to Count 1).

### B.  18 U.S.C. § 3553(a) Factors

#### 1.  The Nature and Circumstances of the Offenses & Impact on the Victims

This was a crime of opportunity.  The defendant and the other *sicarios* hunted down the agents for their vehicle.   Seeing the Suburban pass by, they changed their plans, stalked it, surrounded it, and forced it off the road. Defendants wanted the vehicle and took it without any regard to the consequences for themselves or the victims, as was typical of their callous lifestyle in the Cartel.  The Suburban was valuable to the Cartel because it would resist attacks from rival cartels and the Mexican authorities. Their brazen attack shows how they believed they owned and controlled San Luis Potosi. They acted as if they had a right to anything passing through their "territory."

---

[5] The government will file a separate addendum to this sentencing memorandum detailing the reasons why the government believes that a downward departure is appropriate in this case.

This crime ended the life of Agent Zapata and changed forever the life of Agent Avila. Agent Zapata had arrived in Mexico only days prior, on a temporary duty assignment for which he had volunteered. Agent Zapata was at the beginning of his law enforcement career, following in the footsteps of his father and brothers in his service to the United States.  His life was cut short before he had the chance to truly show what he could achieve, or to have a family of his own. Agent Zapata's death took and continues to take a serious toll on his family.  His parents and brothers continue to mourn his loss, and sitting through the defendants' three-week trial served to reopen their emotional wounds.

Agent Avila's life has not been, and may never be the same. Although Agent Avila survived the attack, he carries the memory and the scars of February 15, 2011, with him forever. He had difficulty recovering from the physical, mental and emotional toll of the attack, and it ultimately resulted in him leaving a career at the Department of Homeland Security.  The attack also had a serious impact on Agent Avila's family, who had to live through the trauma of the attack while located in Mexico City, including Mrs. Avila who listened to her husband's cries for help when he called into the U.S. Embassy during the attack.

### 2.  The History and Characteristics of the Defendant

Catracho's membership in the Zetas Cartel is a unique circumstance from that of the other defendants in this case. Born in Honduras to a family of fifteen children, he made three overland trips to the United States between ages 16-22, in order to pursue job opportunities in Texas. After being removed each time by U.S. authorities, he would endeavor again a few days later to make another overland trip to the United States. On his fourth attempt, in mid-2010, he was captured by individuals associated with the Zetas and eventually held by the Cartel.  He was held for over a

week and tortured by his captors. After being unable to produce any ransom, Catracho convinced his captors that he could be useful and to let him work for the Cartel.

Upon joining the Zetas, Catracho worked for the regional commander, Tartas, for approximately six months, handling radio communications. In late 2010, he was assigned to be a *sicario*, and at some point was sent to a *sicario* training camp where he was taught the operational aspects of being a *sicario*, including how to torture and kill victims. Catracho eventually ended up in Piolin's *estaca* in early 2011. As a *sicario*, Catracho participated in or witnessed numerous violent acts, to include patrolling a portion of Zetas-controlled territory, providing protection for the Cartel's illegal activity from rival cartel members and law enforcement personnel, identifying and eliminating rival cartel members, and engaging in other criminal activity to include, among other things, kidnappings, carjackings, and assassinations. Catracho also took part in approximately twenty armed carjackings in late 2010 and early 2011. In the days following the attack on the ICE Agents, Catracho, together with his *estaca*, participated in a kidnapping of a woman and her son, in order to hold them for ransom. Catracho has stated, however, that he did not personally kill anyone while working as a *sicario*, and the government does not have specific information to the contrary.

Regarding the attack on the ICE Agents, Catracho admitted that he brandished an AR-15 Bushmaster rifle and that he was standing near the passenger side front door of the Suburban. He has consistently denied being one of the *sicarios* who placed his weapon in the window of the Suburban. However, he has admitted that he bragged about being the individual who shot the Agents when he was held in jail, although he stated he did so in order to gain respect from other inmates. Catracho also admitted that he shot at the Suburban numerous times after another *sicario* opened fire on the Suburban, and stated that he was ordered to shoot by Piolin.

14

Catracho has shown remorse for his conduct, at least of late.  Initially, while held in Mexico, he was not remorseful and complained that the response to an American dying was extraordinary given the number of people who die in Mexico every day. Early on in the case, he regularly referred to the attack as an "accident."  However, more recently, Catracho has clarified that he used the term "accident" because it was not his intent that anyone would die when they stopped the Agents' Suburban, but rather that they would take the Suburban without harming anyone. He has also made numerous statements of contrition for his involvement in the attack. In his last meeting with the government in September 2017, he stated that he believed he had been treated fairly and thanked the prosecutors. He also stated that he wanted to ask for forgiveness from the family of Agent Zapata and from Agent Avila and his family.

### 3.  The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public.

Imposing substantial prison terms in this case is absolutely necessary to promote respect for the law, provide just punishment, and afford adequate deterrence.  Standing alone, the violence the defendants wrought was reprehensible and warrants significant prison terms.  Additionally, by imposing substantial prison sentences, the Court will also send the appropriate message regarding the protection of U.S. officials stationed abroad, and the United States' ability and willingness to bring to justice those who would do them harm.  A lengthy period of incarceration is also required to ensure the safety of those who live in defendants' community.

### 4.  The Need to Provide the Defendant with Educational or Vocational Training.

Catracho has received minimal formal education in his life, reporting that he only studied in school in Honduras for a little over one year. During his incarceration in the United States, his command of the English language has vastly improved. As of September 2017, he can communicate in English without a translator about basic subjects. He appears to have taken

advantage of whatever educational opportunities have been provided to him while being held, and seeks out his own opportunities to learn from English-speaking inmates.  He very capable and could benefit from additional educational opportunities while incarcerated.

### 5. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.

The government has fashioned its sentencing recommendations in this case taking into account both the recommended sentences of the defendants convicted at trial and the other four defendants in addition to Catracho who have previously pled guilty and accepted responsibility. Regarding the other defendants, the government's recommendations take into account the comparative conduct of the other defendants, to include the timing of their acceptance of responsibility, the usefulness of any information provided, and the extent of any cooperation. Additionally, the government has considered the relative conduct of each of the cooperating defendants, to include any leadership role in the Cartel, as well as their prior criminal conduct in the Cartel and length of time in the Cartel.  Therefore, the government believes there is no inappropriate disparity in the sentences recommended in these related cases.

### C. Restitution

Because Catracho pled guilty to the murder of Agent Zapata and to attempted murder of Agent Avila, which are crimes of violence under 18 U.S.C. Ch. 1, Sec. 16, he is required to pay restitution under 18 U.S.C. § 3663A.  The government has requested from the victims' families information and documentation related to any potential restitution order in this case, and will forward to the Court and defense counsel any such information or documentation when received. As of the date of this filing, the government has been informed that Agent Avila will request $198,000 in restitution and that he will submit the necessary documentation to support a restitution order for that amount under 18 U.S.C. § 3663A.  Similarly, the government has been informed that

the family of Agent Zapata will request $2,000 in restitution to cover funeral related expenses under 18 U.S.C. § 3663A.  The government respectfully requests that the Court order that the defendants pay restitution for the documented appropriate amount.

## VII.    Conclusion

Given this background, and the substantial assistance that the defendant has provided to the United States, the government submits that a sentence of 30 years' imprisonment on Count 1 and 20 years' imprisonment on Count 2 (to run concurrent to each other), is an appropriate sentence for the defendant in this case.

Respectfully Submitted,

JESSIE K. LIU
United States Attorney for the
District of Columbia

/s/ Fernando Campoamor-Sánchez
MICHAEL C. DILORENZO
FERNANDO CAMPOAMOR-SANCHEZ
Assistant United States Attorneys

DAVID L. JAFFE
Acting Chief
DAVID KARPEL
Trial Attorney
Organized Crime and Gang Section
Criminal Division

ARTHUR WYATT
Chief
KAREN P. SEIFERT
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division

Date: November 1, 2017

17

## **Certificate of Service**

I certify that, by virtue of the Court's ECF system, a copy of the foregoing Sentencing Memorandum and Motion for Downward Departure has been sent to Counsel for the defendant, Carlos Venegas, on November 1, 2017.

/s/ Fernando Campoamor-Sánchez
Fernando Campoamor-Sánchez
Assistant United States Attorney